## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

DEREK JOHNSON,                    :
                                 :    Civil Action No. 07-5109(KSH)
            Petitioner,          :
                                 :
            v.                   :    **OPINION**
                                 :
BRUCE A. HAUCK, et al.,          :
                                 :
            Respondents.         :

**APPEARANCES:**

        DEREK JOHNSON, Petitioner <u>pro</u> <u>se</u>
        #205018
        East Jersey State Prison
        Lock Bag "R"
        Rahway, New Jersey 07065

        CATHERINE ANTOINE FODDAI, ESQ.
        BERGEN COUNTY PROSECUTOR'S OFFICE
        Bergen County Justice Center
        10 Main Street
        Hackensack, New Jersey 07102
        Counsel for Respondents

**HAYDEN**, District Judge

        Petitioner Derek Johnson, a convicted state prisoner

currently confined at the East Jersey State Prison in Rahway, New

Jersey, has submitted a petition for a writ of habeas corpus

pursuant to 28 U.S.C. § 2254.  For the reasons stated herein, the

Petition will be denied for lack of substantive merit.

                    I.  <u>BACKGROUND</u>

A.  <u>Statement of Facts</u>

        The facts of this case were recounted below and this Court,

affording the state court's factual determinations the

appropriate deference, see 28 U.S.C. § 2254(e)(1), will simply reproduce the Appellate Division's factual recitation, as set forth in its May 4, 1995, unpublished Opinion on petitioner's direct appeal from his conviction:

> The facts of this tragic murder case are largely undisputed. Defendant does not deny that he stabbed the victim, Donyale Morton, his former girlfriend. The central dispute during trial was whether defendant possessed the requisite intent to kill or harm her and whether he acted in the heat of passion resulting from a reasonable provocation.
>
> Defendant was born in 1962 and grew up in Teaneck with his father, a dentist, his mother and older sister. While in the Teaneck public schools, defendant was a straight-A student and excelled in sports and music. In the tenth grade, he attended Phillip Exeter Academy on a partial scholarship. However, after receiving poor grades and a period of counseling, he dropped out of Exeter. In 1980, he completed highschool at a school for gifted students. He thereafter attended New York University and Farleigh Dickinson University for brief periods, and later held various temporary jobs.
>
> In 1982, defendant met the victim, Donyale Morton, then a junior in highschool and fourteen years of age. Donyale's friends characterized defendant as very possessive of her. Their relationship was "on again off again" and during the "off" periods, defendant would follow Donyale to her home to try and convince her to reconcile with him.
>
> During the 1983-85 period, defendant's relationship with his father was strained, in part due to defendant's lack of career and purpose. Also, defendant's father felt strongly that defendant should not be involved with a young girl.
>
> In 1984, Donyale became pregnant and had an abortion. Thereafter, relations between Donyale and defendant deteriorated. In 1985, Donyale began making plans to spend her senior year in high school in Spain. Defendant resisted Donyale's plans.
>
> During the spring and summer of 1985, defendant lost approximately twenty-five to thirty pounds and, according to his mother, had lost interest in his usual activities.

2

Other friends of defendant noticed that he appeared gaunt and was not himself.  Donyale's mother testified that during this period her family received a series of late-night calls from the defendant.  She also described how he drove by the house late at night yelling that her husband was a "faggot" and that she was an "idiot."

On July 20, 1985, defendant's father and sister, Kim, were involved in an altercation.  Defendant interceded.  As a result, the father expelled both defendant and Kim from the home.  Defendant thereafter began to live in his mother's car.  During the ensuing week of homelessness, defendant's depression increased and his actions became more erratic.

On July 27, 1985, the day of Donyale's death, defendant telephoned her home and spoke to Donyale's mother. Defendant told the mother that he loved Donyale and explained to her that he wanted to tell her "something heavy."  He then revealed to the mother that Donyale had had an abortion. The mother responded that it was evident to her that defendant and Donyale should not be together and that he should try to find something to do with his life.  Donyale interceded in the phone conversation and told defendant that she was finished with him.

Later that day, defendant went to his parents' home intending to speak to his father.  Defendant told his mother that he was not doing well and read to her an Ernest Hemingway passage which distressed her.  As defendant left the house to meet a friend, he told his father that he loved him and had always loved him.

Defendant and his friend spent a few hours at a bar. Defendant had a couple of beers.  He returned home and told Kim to get rid of his clothes if anything happened to him, and responded in the affirmative when she asked him if he was going to commit suicide.  Shortly after this conversation, defendant's mother received a phone call from defendant's friend's mother which caused her to faint.  Kim then took the phone and called a suicide hotline.

When Kim attempted to speak with defendant, he told her to stay away from him and drove from the home.  Kim observed defendant holding a knife before he entered the vehicle.

At approximately 10:40 p.m. that evening, defendant confronted Donyale at Santoro's Restaurant, where she was working as a waitress.  Defendant described his version of

3

the events that followed to both Dr. Frank Riccioli, a
defense psychiatrist, and Dr. Steven Simring, the State's
psychiatrist.  Defendant stated that he pulled up alongside
Donyale's car when she was getting into it.  He came around
to the driver's side of her vehicle to speak with her.  Both
doors to his car were open and the motor was running.
Defendant asked Donyale "about us, about me, about going to
Spain."  Defendant told her that his life depended on this,
"can't you put out something extra for me?"  Defendant
implored her to accompany him to see a house that he liked
in Weehawken, but Donyale refused and said she had to go
home.  She also rolled her eyes when he asked what had
happened earlier in the day.  Defendant then tried to get
her to come out of the car and, as defendant explained to
Dr. Riccioli:

> I grabbed her hand to come out, the door was open, she
> resisted.  I didn't let go.  She pulled me in, we
> started fighting.  I was choking her, she was biting me
> and scratching me and this was the first physical fight
> I ever had with her.  She was yelling and screaming for
> help, I just want to shut -- I just wanted her to shut
> up and she was yelling and screaming and biting and
> scratching.  We had fallen out on the passenger side of
> her car, my driver's door was open and my engine was
> running.  I reached in my car and I grabbed the knife
> from the floor of the car.  I used the knife to eat
> blueberry muffins I like.  I started stabbing her
> because I wanted her to be quiet, to shut up, to slow
> down.

Defendant then stabbed Donyale three or four times in the
stomach, "but it almost looked like I didn't even stab her."
Donyale started to run toward a passing car for help.
Defendant caught up with Donyale and stabbed her in the
back.  They then fell to the ground, "like a little kid
beating another little kid up" and defendant stabbed Donyale
in the neck.  Defendant drove home, not knowing whether
Donyale was dead.

Defendant gave essentially the same account to Dr. Simring,
although he added that he must have "snapped" when Donyale
scratched his face and he became aware he was bleeding.  He
also stated that the stabbing had a movie-like quality, that
he felt like an automaton, and was not aware that he was
stabbing Donyale.

Donyale died at 4:19 a.m. on July 28, 1985, from loss of
blood from multiple stab wounds.  She had sustained a major
wound which had severed her neck muscles, voice box and

jugular vein.  A stab wound to the chest had cut the right lobe of her liver, severing her aorta and penetrating so deeply it hit the vertebral column.  She had classic defense wounds on her hands.

Before she died, Donyale stated that "Derek Johnson" had stabbed her.  After overhearing a police officer tell a nurse that he thought the stabbing was a result of girlfriend/boyfriend problem, Donyale stated "[y]es."  When asked about the motive for the attack, she replied "Broke up."  A serrated steak knife bent into a "U" or "V" shape was found at the parking lot where the attack occurred.  Defendant's fingerprints were found on the front windshield, the driver's side door and around the window of the rear door of Donyale's car.

After the attack, defendant went back home, retrieved another knife, and proceeded to the George Washington Bridge.  He parked his car and, at 1:40 a.m., climbed to the top of the inside barrel cables over the roadway and pedestrian walkway.  Port Authority Lieutenant Anthony Whitaker joined defendant on the barrel cable and came within six to eight feet of him.  Defendant warned him not to come any closer and, when Whitaker did, defendant backed up and rocked the wire supports.  This action prompted Whitaker to call for New York City Emergency Services.

Eventually, two teams from Emergency Services converged on defendant from above and below.  One of the officers told him not to kill himself because his girlfriend was all right.  When the emergency personnel reached within a foot or two of him, defendant pulled out a knife and stabbed himself in the stomach.  The officers then closed in, grabbed the knife, and handcuffed defendant at approximately 4 a.m.

Once defendant was apprehended, he was given <u>Miranda</u>[1] warnings by Lieutenant Whitaker and was turned over to the Teaneck Police.  Defendant was thereupon transported to Holy Name Hospital where he was met by members of the Bergen County Prosecutor's Office.  Sergeant Michael Carlino of the Bergen County Prosecutor's Office readministered <u>Miranda</u> warnings.  Defendant thereafter proceeded to explain that he had met his girlfriend behind the store where she worked and that they had argued because she wanted to go to Spain and break up with him.  He then admitted stabbing Donyale and announced that he had a mental problem, commenting "[m]y problem is a lack of a problem."  He explained that he was

---

[1] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

sad when he woke up that morning because some children had
been killed a year ago and he could not help them.
Concerning Donyale, he said he "love[d] her to death."

Defendant then stated his view that the police officers were
prosecutors who built their reputations on prosecuting
people.  One of the investigators assured defendant that all
they wanted was the truth.  At that point, a member of the
hospital staff walked into the room and defendant stated
forcefully, "[t]hey're not done yet."  When questioning
resumed, defendant recounted that he had stabbed Donyale at
least four times - - once in the stomach, twice in the neck,
and once in the back.  He asked the investigators whether
the knife had been recovered and observed rhetorically "[i]t
was bent, wasn't it?"  Defendant speculated that the knife
"must have cut cartilage, or bone or something."

At the conclusion of the interview, defendant refused to
give a formal statement, explaining that he had "been good"
to the investigators but that he was tired, had just killed
someone or almost killed someone and wanted to be alone with
Donyale.  Defendant was thereafter transported to the Bergen
Pines Hospital because Holy Name Hospital had no facility
for holding prisoners.

The defense presented the testimony of two experts Dr. Louis
Schlesinger, a forensic psychologist, and Dr. Frank
Riccioli, a psychiatrist.  Both agreed that defendant was
highly intelligent and that he had a narcissistic
personality disorder.  Schlesinger explained that
individuals with such disorders have chronic difficulties in
dealing with others and in functioning in life.  Such
individuals have "borderline traits," that is, they
"function . . . at the border . . . between a psychotic
individual who is out of touch with reality and someone who
is more stable and in touch with reality[.]" He explained
that such individuals often appear grandiose and arrogant,
but internally feel weak, empty and inadequate.

Dr. Schlesinger stated that defendant exhibited "borderline"
traits; he functions at the dividing line between psychosis
and a stable view of reality.  According to the doctor, the
fact that defendant had been ordered out of his parents'
home could have caused a psychotic break.  He explained
that, while every individual has a breaking point,
defendant's personality disorder made him more vulnerable
than others.  However, he had no opinion as to whether
defendant suffered a psychotic break at the time of the
homicide and volunteered that, even if defendant had, it was
possible he could still reason and form purpose and

knowledge, but that it was equally possible that he could not.

Dr. Riccioli rendered the opinion that he did not believe defendant was legally insane at the time of the offense.  In other words, defendant knew he was in Teaneck, knew he was talking to Donyale and understood he was plunging a knife into her.  However, the doctor maintained that defendant did not know the harmful consequences of stabbing Donyale.  It was his view that in stabbing the victim, defendant's "purpose" was to quiet her screams so that he could talk to her.  The expert, however, believed that defendant was absolutely not able to form the purpose to kill Donyale.  Also, Dr. Riccioli did not know whether defendant was aware that Donyale would bleed from the stab wounds.  He acknowledged at a prior hearing he had interpreted defendant's flight from the scene as indicative both of his awareness that he had done something wrong and of his desire to kill himself.

Dr. Steven S. Simring, the State's psychiatrist, testified that defendant did not exhibit any overt psychiatric symptoms at the time of the homicide.  He concluded that defendant was clear-headed, in touch with reality, and was at all times capable of forming purpose and acting with knowledge.  In Dr. Simring's view, his opinion was corroborated by the admitting records at Bergen Pines, which noted that defendant was not experiencing auditory hallucinations, was "in all three spheres" and had an intact memory.  Dr. Simring also noted that the report indicated that defendant became coherent and logical after continued questioning.

Defendant did not testify on his own behalf.

Based on the foregoing evidence, the trial judge granted defendant's request to charge passion/provocation manslaughter and diminished capacity.  During deliberations, the jury requested that the trial judge redefined "knowledge" and "purpose" in the context of the charge of murder, and passion/provocation manslaughter.  It also asked to be reinstructed on the significance of flight from the scene of the crime.  The jurors also queried whether they had to be unanimous on whether defendant acted with either purpose of knowledge, or whether half could believe that he acted with knowledge and half with purpose.  The trial judge reread the pertinent instructions and advised the jury that it had to be unanimous as to whether defendant acted with purpose or with knowledge.

In answer to a jury interrogatory, the jury convicted
defendant of purposely or knowingly causing the death of
Donyale, while not in the heat of passion resulting from
provocation.

(May 4, 1995 Appellate Division Opinion, at Exhibit 3, Da344-
DA353).[2]

---

[2] Respondents provided this Court with the relevant state
court record, denoted as follows:

Exhibit 1: Petitioner's brief and Volume I of the appendix
   filed in support of petitioner's appeal from denial of
   his state post-conviction relief ("PCR") petition (Da1
   to Da155).
Exhibit 2: Volume II of petitioner's appendix filed in
   support of his appeal from denial of state PCR (Da161-
   Da326).
Exhibit 3: Volume III of petitioner's appendix filed in
   support of his appeal from denial of state PCR (Da327-
   Da521).
Exhibit 4: Volume IV of petitioner's appendix filed in
   support of his appeal from denial of state PCR (Da522-
   Da652).
Exhibit 5: State's letter-brief on appeal from denial of
   state PCR.
Exhibit 6: Petitioner's reply brief on appeal from denial of
   state PCR.
Exhibit 7: Opinion of Appellate Division, filed August 16,
   2006, affirming denial of PCR, State v. Derek Johnson,
   Docket No. A-1219-04T4 (App. Div., Aug. 7, 2006).
Exhibit 8: Petitioner's petition for certification and
   appendix to the Supreme Court of New Jersey.

Exhibits 9 through 27: 19 volumes of transcripts as follows:

 1T - September 19, 1991 trial transcript (Exhibit 9)
 2T - September 20, 1991 trial transcript (Exhibit 10)
 3T - September 23, 1991 trial transcript (Exhibit 11)
 4T - September 24, 1991 trial transcript (Exhibit 12)
 5T - September 25, 1991 trial transcript (Exhibit 13)
 6T - September 26, 1991 trial transcript (Exhibit 14)
 7T - September 30, 1991 trial transcript (Exhibit 15)
 8T - October 1, 1991 trial transcript (Exhibit 16)
 9T - October 2, 1991 trial transcript (Exhibit 17)
10T - October 3, 1991 trial transcript (Exhibit 18)
11T - October 7, 1991 trial transcript (Exhibit 19)
12T - October 8, 1991 trial transcript (Exhibit 20)
13T - October 9, 1991 jury charge transcript (Exhibit 21)

B.  Procedural History

Petitioner, Derek Johnson ("Johnson"), was charged with one count of knowing or purposeful murder of Donyale Morton, in violation of N.J.S.A. 2C:11-3a(1) and (2), under Bergen County Indictment NO. S-1135-85.  Johnson was first tried on the murder charge in 1986, but the matter was reversed on appeal and remanded for retrial.[3]

On retrial, the matter was assigned to the Honorable Andrew P. Napolitano, J.S.C.  Trial proceeding began on September 19, 1991 and concluded on October 10, 1991, with the jury returning a verdict of guilty on the single charge of knowing or purposeful murder.  Sentencing proceedings were conducted on December 6, 1991.  Judge Napolitano sentenced Johnson to thirty (30) years in prison with a 30-year parole ineligibility.

---

14T - October 10, 1991 trial transcript (Exhibit 22)
15T - October 10, 1991 trial transcript, Part 2 (Exhibit 23)
16T - December 6, 1991 sentencing transcript (Exhibit 24)
17T - November 5, 1993 transcript of bail motion pending appeal (Exhibit 25)
18T - January 28, 2000 PCR1 transcript (Exhibit 26)
19T - August 9, 2004 PCR2 transcript (Exhibit 27)

[3]  In Johnson's first trial, the jury rejected diminished capacity as a basis for reducing culpability and also rejected passion/provocation manslaughter, finding petitioner guilty of murder.  The Superior Court of New Jersey, Appellate Division reversed that conviction, pursuant to Humanik v. Beyer, 871 F.2d 432 (3d Cir.), cert. denied, 483 U.S. 812 (1989), because the jury instructions placed the burden on defendant to prove the defense of passion/provocation rather than on the State to disprove it.

Johnson filed a direct appeal from this 1991 conviction.  He
raised the following issues on appeal:

Point I:   The verdict should be reversed because of the
           trial court's impropriety in selecting a jury
           foreman.
Point II:  The conviction should be reversed because it is
           against the weight of the evidence.
Point III: The trial court erred in failing to weigh the
           aggravating and mitigating factors at sentencing.
Point IV:  Improper remarks by the prosecutor during
           summation prejudiced the jury and should have
           resulted in a mistrial.
Point V:   There was insufficient evidence of flight and the
           trial court erred in giving a "flight" charge.
Point VI:  The trial court erred in denying defendant's
           motion for reconsideration of the sentence.
Point VII: The trial court erred in not <u>sua</u> <u>sponte</u> giving a
           jury charge as to insanity.

Johnson raised additional claims on direct appeal, as follows:

Point I:   The trial court's failure to charge insanity
           violated his right to a fair trial.
Point II:  The diminished capacity charge unconstitutionally
           relieved the State of its burden to prove that
           defendant acted purposefully or knowingly despite
           mental disease or defect.
Point III: The verdict for knowing or purposeful murder
           should be reversed as being against the weight of
           the evidence.
Point IV:  The court erred in denying defendant's motion for
           a mistrial after Dr. Simring informed the jury of
           defendant's prior arrest in violation of an
           express order.
Point V:   The prosecutor's opening statement and summation
           far exceeded the bounds of propriety and denied
           petitioner a fair trial.
Point VI:  The trial court erred in failing to follow proper
           guidelines, including the application of <u>N.J.S.A.</u>
           2C:44-1(f)(2).

In an unreported per curiam opinion filed May 4, 1995, the
Appellate Division found all of petitioner's claims to be without
merit and affirmed the conviction and sentence.  (May 4, 1995
Appellate Division Opinion, at Exhibit 3, Da342-Da368).  Johnson

filed a petition for certification with the Supreme Court of New Jersey.  Certification was denied in a form order filed on October 11, 1995.  (Exhibit 3, Da421).

Thereafter, on December 6, 1996, Johnson filed his first state PCR petition, raising a multiplicity of claims.  The matter was assigned to the Honorable John Conte, J.S.C.  Judge Conte denied the PCR petition in a letter opinion dated September 23, 1997.  (Exhibit 3, Da442).  A conforming order was filed on January 5, 1998.  (Exhibit 3, Da444).  Johnson appealed this decision.  After conferencing the matter, the appeal was dismissed by order filed October 22, 1998, and the matter was reinstated for representation with appointment of counsel. (Exhibit 3, Da445).

Johnson supplemented his petition, and sought a change of venue and recusal of any judge sitting in Bergen County because his trial counsel, against whom he was making claims of ineffective assistance of counsel, had been appointed to the bench and was assigned as the presiding judge in the Family part, Bergen County.  The PCR petition was assigned to Judge Conte again, and oral argument was heard on January 28, 2000 with appointed counsel for petitioner and the State.  Judge Conte denied the PCR petition on the record and issued a conforming order filed February 18, 2000.

Johnson appealed Judge Conte's decision denying his PCR petition.  In an order filed May 8, 2001, the Appellate Division

remanded the matter for a full hearing on the merits.  (Exhibit 3, Da521).  Petitioner had a newly appointed counsel who submitted a brief further advancing petitioner's claims for post-conviction relief.  The case was assigned to Judge Conte for the third time, and argument was heard on August 9, 2004.  In a written opinion dated August 11, 2004, Judge Conte denied the PCR petition, and a conforming order was filed on August 27, 2004.  (Exhibit 4, Da642-Da650; Da651).

Johnson filed an appeal from this third denial of his PCR petition.  The Appellate Division affirmed denial of PCR in a written opinion filed on August 16, 2006.  (State v. Derek Johnson, Docket No. A-1219-04T4, 2006 WL 2237807 (App. Div., Aug. 7, 2006))(Exhibit 7).  Johnson then filed a petition for certification with the Supreme Court of New Jersey.  On November 9, 2006, certification was denied.

Johnson filed this habeas petition under 28 U.S.C. § 2254 on or about September 23, 2007.[4]  The State filed a response to the

---

[4]  Pursuant to the "prison mailbox rule," a habeas petition is deemed filed on the date the prisoner delivers it to prison officials for mailing, not on the date the petition is ultimately filed with the court.  See Houston v. Lack, 487 U.S. 266, 270-71 (1988); see also Burns v. Morton, 134 F.3d 109, 112-13 (3d Cir. 1998) (applying prison mailbox rule set forth in Houston, which dealt with filing of an appeal, to a pro se prisoner's filing of a habeas petition).  Although the Court is unable to determine from the face of the petition the exact date that Johnson handed his petition to prison officials for mailing, Johnson signed the petition on September 23, 2007.  See Henderson v. Frank, 155 F.3d 159, 163-64 (3d Cir. 1998) (using date prisoner signed petition as date he handed it to prison officials for purposes of calculating timeliness of habeas petition).  Accordingly, the Court finds that September 23, 2007, rather than October 24, 2007 (the date the petition was received in the Clerk's office), was

petition, including the relevant state court record, on May 19, 2008.  Petitioner has not filed a traverse or reply to respondents' answer.

## II.  STATEMENT OF CLAIMS

Johnson raises the following claims for habeas relief in his petition:

Ground One:  Petitioner was denied effective assistance of counsel based on counsel's failure to pursue expert opinion and testimony sufficient to support a defense of insanity.

Ground Two:  Petitioner received a disproportionate sentence in comparison to other individuals indicted for murder the same year as petitioner.  He alleges selective prosecution and denial of opportunity for plea bargaining.

The State contends that the petition should be denied for lack of substantive merit.  In addition, the State argues that petitioner's Ground Two is procedurally defaulted and fails to state a cognizable claim of a federal constitutional deprivation. The State does not advance the affirmative defense that the habeas petition may be time-barred, and submits that petitioner's habeas claims have been exhausted on state court review.

## III.  STANDARD OF REVIEW

A pro se pleading is held to less stringent standards than more formal pleadings drafted by lawyers.  Estelle v. Gamble, 429 U.S. 97, 106 (1976); Haines v. Kerner, 404 U.S. 519, 520 (1972).

_____

the date this petition was filed for purposes of calculating the timeliness of the petition.

A pro se habeas petition and any supporting submissions must be construed liberally and with a measure of tolerance.  See Royce v. Hahn, 151 F.3d 116, 118 (3d Cir. 1998); Lewis v. Attorney General, 878 F.2d 714, 721-22 (3d Cir. 1989); United States v. Brierley, 414 F.2d 552, 555 (3d Cir. 1969), cert. denied, 399 U.S. 912 (1970).  Because petitioner is a pro se litigant, the Court will accord his petition the liberal construction intended for pro se petitioners.

Under § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), federal courts in habeas matters must give considerable deference to determinations of the state trial and appellate courts.  See 28 U.S.C. § 2254(e); Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 122 S.Ct. 269 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996)(citing Parke v. Raley, 506 U.S. 20, 36 (1992)).  Section 2254(d) sets the standard for granting or denying a habeas writ:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In Williams v. Taylor, 529 U.S. 362 (2000), the Supreme Court explained that subsection (d)(1) involves two clauses or conditions, one of which must be satisfied before a writ may issue.  The first clause, or condition, is referred to as the "contrary to" clause.  The second condition is the "unreasonable application" clause.  Williams, 529 U.S. at 412-13.  In the "contrary to" clause, "a federal court may grant the writ if the state arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts."  Id.  Under the "unreasonable application" clause, a federal court may grant the writ if "the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [the petitioner's] case."  Id. at 413.  Habeas relief may not be granted under the "unreasonable application" condition unless a state court's application of clearly established federal law was objectively unreasonable; an incorrect application of federal law alone is not sufficient to warrant habeas relief.  Id. at 411.  See also Werts, 228 F.3d at 197; Matteo v. Superintendent, SCI Albion, 171 F.3d 877, 891 (3d Cir. 1999), cert. denied sub nom Matteo v. Brennan, 528 U.S. 824 (1999).

Consonant with Williams, the Third Circuit has held that

§ 2254(d)(1) requires a federal habeas court to make a two step inquiry of the petitioner's claims.  First, the court must examine the claims under the "contrary to" provision, identify the applicable Supreme Court precedent and determine whether it resolves petitioner's claims.  See Werts, 228 F.3d at 196-97; Matteo, 171 F.3d at 888-891.  If the federal court determines that the state court's decision was not "contrary to" applicable Supreme Court precedent, then the court takes the second step of the analysis under § 2254(d)(1), which is whether the state court unreasonably applied the Supreme Court precedent in reaching its decision.  Werts, 228 F.3d at 197.

This second step requires more than a disagreement with the state court's ruling because the Supreme Court would have reached a different result.  Id.  AEDPA prohibits such de novo review.  Rather, the federal habeas court must determine whether the state court's application of the Supreme Court precedent was objectively unreasonable.  Id.  In short, the federal court must decide whether the state court's application of federal law, when evaluated objectively and on the merits, resulted in an outcome that cannot reasonably be justified under existing Supreme Court precedent.  Id.; see also Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005).

Even a summary adjudication by the state court on the merits of a claim is entitled to § 2254(d) deference.  Chadwick v. Janecka, 312 F.3d 597, 605-06 (3d Cir. 2002), cert. denied, 538

16

U.S. 1000 (2003)(citing Weeks v. Angelone, 528 U.S. 225, 237 (2000)).  With respect to claims presented to, but unadjudicated by, the state courts, however, a federal court may exercise pre-AEDPA independent judgment.  See Hameen v. State of Delaware, 212 F.3d 226, 248 (3d Cir. 2000), cert. denied, 532 U.S. 924 (2001); Purnell v. Hendricks, 2000 WL 1523144, *6 n.4 (D.N.J. 2000).  See also Schoenberger v. Russell, 290 F.3d 831, 842 (6th Cir. 2002) (Moore, J., concurring) (and cases discussed therein).

Finally, federal courts are required to apply a "presumption of correctness to factual determinations made by the state court."  Id.; see also 28 U.S.C. § 2254(e)(1).  The Third Circuit has ruled that this presumption of correctness based upon state court factual findings can only be overcome by clear and convincing evidence.  See Duncan, 256 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).  Consequently, a habeas petitioner "must clear a high hurdle before a federal court will set aside any of the state court's factual findings."  Mastracchio v. Vose, 274 F.3d 590, 597-98 (1st Cir. 2001).

IV.  ANALYSIS

A.  Ineffective Assistance of Trial Counsel

The right to counsel is the right to effective assistance of counsel, and counsel can deprive a defendant of the right by failing to render adequate legal assistance.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).  Under Strickland, a petitioner seeking to prove a Sixth Amendment violation must

demonstrate that his counsel's performance fell below an objective standard of reasonableness, assessing the facts of the case at the time of counsel's conduct.  <u>Id</u>. at 688-89; <u>Jacobs v. Horn</u>, 395 F.3d 92, 102 (3d Cir. 2005), <u>cert</u>. <u>denied</u>, <u>Jacobs v. Beard</u>, 126 S.Ct. 479 (2005); <u>Keller v. Larkins</u>, 251 F.3d 408, 418 (3d Cir. 2001).  Counsel's errors must have been "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Strickland</u>, 466 U.S. at 688.  "In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." <u>Id.</u>  The Supreme Court further explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."

<u>Id.</u> at 689 (citations omitted); <u>see also Virgin Islands v. Wheatherwax</u>, 77 F.3d 1425, 1431 (3d Cir. 1996).

If able to demonstrate deficient performance by counsel, the petitioner must also show that counsel's substandard performance

actually prejudiced his defense.  Strickland, 466 U.S. at 687.
Prejudice is shown if "there is a reasonable probability that,
but for counsel's unprofessional errors, the result of the
proceeding would have been different.  A reasonable probability
is a probability sufficient to undermine confidence in the
outcome."  Id. at 694.  The reviewing court must evaluate the
effect of any errors in light of the totality of the evidence.
Id. at 695-96.  Thus, the petitioner must establish both
deficient performance and resulting prejudice in order to state
an ineffective assistance of counsel claim.  Id. at 697; see also
Jacobs, 395 F.3d at 102; Keller, 251 F.3d at 418.

In this case, Johnson asserts that his counsel was
ineffective for not pursuing an insanity defense.  In Johnson's
first trial, he was convicted of murder, but the conviction was
reversed and the matter remanded because of an instructional
error.  The Appellate Division commented that, on retrial, the
trial court could consider giving an insanity instruction,
however, such an instruction was not mandated.  On retrial,
Johnson's trial counsel expressly informed the jury during the
opening statement and summation that petitioner was not advancing
an insanity defense.  Further, at the request of defense counsel,
the trial judge advised the jury during the jury charge that
there was no insanity defense being raised by Johnson.  Rather,
the defense strategy was based on diminished capacity and

passion/provocation to negate the requisite mental state for knowing and purposeful murder.

Having been convicted for murder on retrial, Johnson raised the issue on direct appeal that the trial judge should have charged the jury sua sponte on insanity.  The Appellate Division rejected this claim, observing that:

> The insanity defense is related to, but distinct from, the defense of diminished capacity.  See Cannel, New Jersey Criminal Code Annotated, comment 2 to N.J.S.A. 2c:4-2.  The diminished capacity defense is not one of diminished or partial responsibility, but rather allows the admission of evidence of a mental disease or defect for the purpose of negating one of the elements of a crime.  [State v.] Breakiron, 108 N.J. [591, 609 (1987)].  The presence of a mental disease or defect does not transfer murder, as a matter of law, into manslaughter or aggravated manslaughter, but it is relevant to the question whether in fact a defendant's state of mind, because of its diminished capacity, could be found to meet the requirement of manslaughter.  Id. at 609-10; [State v.] Ramseur, 106 N.J. [123, 270 n.61 (1987)].
>
> While evidence offered on an insanity defense might also support a diminished capacity defense, the opposite is not necessarily true, at least in this case.  There was no expert testimony that defendant was psychotic, and no testimony that he suffered a psychotic break at the time of the incident.  Dr. Riccioli went the farthest down this path when he emphasized that defendant was stabbing Donyale to quiet her, not to cause her death.  However, he volunteered no opinion that defendant did not know his action was wrong -- indeed, he conceded that defendant's departure from the scene might have evidenced a consciousness of guilt at that point.  Further, Dr. Riccioli stated that he did know whether defendant knew that his stabbings would cause Donyale to bleed (and by extension, cause serious bodily injury).
>
> Thus, on the critical questions whether defendant knew the nature and quality of his act, and/or knew whether what he was doing was wrong, defendant offered no evidence, expert or otherwise, to support an insanity defense.  Indeed, defendant's own statements to the police and psychiatrists tend to demonstrate that he did know the nature and quality

of his actions: he noted his surprise that Donyale did not
seem to bleed, for example, and shortly after the accident
he spoke to the police about having perhaps hit bone or
cartilage when he stabbed her in the back.  These statements
betray an awareness of the normal physical consequences of
stabbing a person.

Moreover, even if the facts supported an insanity defense,
we cannot ignore defense counsel's strategy in expressly
asking the trial judge not to charge it. ...

Here, defense counsel was emphatic that the insanity defense
was not implicated.  Counsel was obviously seeking to shift
the jurors' attention from the medical and legal concepts of
insanity in order to focus their attention on defendant's
incapacity to form the requisite purposeful or knowing state
of mind to commit murder.  We agree with the State that in
view of the tactical decision made by defendant, the judge
properly did not intercede in giving the insanity defense to
the jury.

(May 4, 1995 Appellate Division Opinion, Exhibit 3, Da364-Da367).

Johnson then advanced the insanity issue in his PCR

petition, claiming that his trial counsel was ineffective for not

pursuing an insanity defense.  Judge Conte rejected this claim.

Following the standard set forth in Strickland, the PCR court

ruled:

Defendant argues that there was substantial evidence to
support an insanity defense and/or diminished capacity
defense.  Defendant relies upon the opinion of Dr. Riccioli,
who stated that defendant did not fit into the statutory
definition of insanity.  It was never disputed that
defendant killed the victim, Donyale Morton.  The issue was
the defendant's state of mind, and to that end defense
counsel produced numerous witnesses to testify.  The defense
rigorously pursued a diminished capacity defense which
ultimately failed when the jury returned a verdict of guilty
to murder.  The assertion that a diminished capacity defense
was not pursued is baseless.

With respect to the issue of insanity, defendant claims that
there was sufficient evidence in the record to request a
charge on insanity and failure to do so, rendered defense
counsel ineffective.  However, defendant's own psychiatrist

21

testified that he was in touch with reality at the time of the crime, that he was free of hallucinations or delusions, that he was not psychotic, had no distortion as to time and place, knew that the victim had broken up with him, and was not legally insane at the time of the crime.  (9T 183-2 to 22, 10T 3-18 to 5-21, 10T 7-12 to 21, 10T 8-3 to 6, 10T 9-17 to 22, 10T 13-16 to 19).  His psychologist, despite much speculative testimony on psychosis and narcissism, ultimately rendered no opinion whatsoever on defendant's state of mind at the time of the crime.  (8T 153-24 to 154-3).  Finally, the two Bergen Pines doctors, neither of whom testified, concluded that defendant was narcissistic, but found no evidence of psychosis.  (PT 155-18 to 157-20, 11T 8-2 to 10, 11T 9-3 to 13).

Defendant also maintains that trial counsel failed to interview or call as witnesses any of the staff physicians who treated him at Bergen Pines Hospital.  However, the two doctors that defendant refers to concluded that defendant was narcissistic, but found no evidence of psychosis, a diagnosis that was consistent with the State's psychiatrist, Dr. Simring.

Finally, defendant asserts that trial counsel failed to conduct any research on the applicable law on the insanity defense.  However, defendant fails to provide any factual support for this allegation.  To make a prima facie claim of ineffective assistance of counsel, defendant bears the burden of pleading facts, not conclusions, which, if true, would entitle him to relief.  In the case at bar, defendant's petition is completely devoid of any assertion as to the information that would have been obtained from such efforts.  Thus, it falls far short of a prima facie showing of ineffective assistance of counsel.  State v. Cummons, 321 N.J. Super. 154, 170 (App. Div.), certif. denied, 162 N.J. 199 (1999).

It cannot be concluded "that counsel made errors so serious that he was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Strickland at 668.  Based on the foregoing reasons, defendant has failed to satisfy the two prong test in accordance with Strickland.

(August 11, 2004 letter opinion, Exhibit 4, Da648-Da650).

On appeal from denial of PCR, the Appellate Division also rejected Johnson's ineffective assistance of trial counsel claim. The court found:

Defendant clearly suffered from significant emotional problems at the time he killed his girlfriend. But none of the three experts who testified at trial, a psychiatrist and a psychologist for the defense and a psychiatrist for the State, found him to meet the legal definition of insanity. The consensus, in fact, was that he suffered from "borderline personality disorder" and a "narcissistic" personality. The jury heard extensive and largely undisputed testimony about defendant's conduct on the night in question. The jury also heard expert opinions about defendant's mental condition and determined that he had the requisite purpose or knowledge to satisfy the mens rea element of murder.

The thrust of defendant's argument on this appeal is that trial counsel, the trial judge, and the post-conviction relief judge all addressed the insanity issue "with a fundamental misconception and misperception of the issue, namely the distinction between a clinical finding of mental disease and defect and the underlying criteria for an insanity defense under N.J.S.A. 2C:4-1. ..." We disagree.

On direct appeal, we rejected defendant's arguments that the trial judge should have given an insanity charge sua sponte, and that the jury charge on diminished capacity was in error. Because we have previously concluded that the expert evidence did not support an insanity defense, defendant cannot establish the second prong of an ineffective-assistance-of-counsel argument. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L. Ed.2d 674, 693 (1984), and United States v. Cronic, 466 U.S. 648, 656-62, 104 S.Ct. 2039, 2045-48, 80 L. Ed.2d 657, 666-70 (1984), which we adopted as a matter of state law in State v. Fritz, 105 N.J. 42, 52 (1987). Judge Conte's finding that defendant failed to present a prima facie case of ineffective assistance is well-founded, and no evidentiary hearing was required. Compare State v. Preciose, 129 N.J. 451, 462-64 (1992).

(August 7, 2006 Appellate Division Opinion, Exhibit 7, pp. 24-25).

Here, petitioner has made no showing to contradict the state court rulings finding that there was no ineffective assistance of counsel respecting the insanity defense issue. Moreover, even if Johnson could show that the actions (or inactions) of his counsel

23

were deficient, he cannot satisfy the prejudice prong under
Strickland.  Both the PCR court and Appellate Division found that
there was no factual or opinion evidence to support an insanity
defense.  Thus, Johnson can not argue that trial counsel's
alleged failure to pursue an insanity defense actually prejudiced
him and resulted in his conviction for knowing and purposeful
murder.  In other words, Johnson has not demonstrated how his
defense counsel could have done anything that would have served
to change the outcome this matter, especially where there was no
expert testimony or opinion that petitioner was legally insane at
the time of the crime.

This Court is satisfied from its review of the pertinent
state court record that there was ample evidence to support the
state court rulings on this issue.  This Court also finds that
Johnson has not established a constitutional violation; nor has
he shown, as required under 28 U.S.C. § 2254(d), that the actions
of the state courts resulted in a decision that was contrary to,
or involved an unreasonable application of, clearly established
federal law, as determined by the Supreme Court in Strickland, or
resulted in a decision that was based on an unreasonable
determination of the facts in light of the evidence presented in
the state court proceedings.  Therefore, this ineffective
assistance of trial counsel claim for habeas relief will be
denied.

B.   <u>Selective Prosecution Claim</u>

Next, Johnson argues that the prosecutor's failure to offer him a plea bargain amounts to selective prosecution and led to a "vastly disparate punishment."  He points to two defendants indicted for murder the same year as petitioner who received plea bargains that reduced their charges to manslaughter.  He claims this difference in the resulting sentences was arbitrary and discriminatory.

This claim will be dismissed because Johnson cannot show any federal constitutional violation.  The State argues that a plea reduction had never been offered to Johnson or his defense counsel because the strength of the State's case against Johnson did not warrant a reduced plea offer.  In addition, the State pointed to the heinous and cruel nature of the crime and the wishes of the victim's family in choosing to prosecute Johnson for murder rather than tender a plea bargain.  This Court agrees with the State's argument.  A defendant cannot compel the State to offer a plea.  The decision whether to engage in plea bargaining rests completely with the prosecutor.  <u>Marbry v. Johnson</u>, 467 U.S. 504, 507 n.5 (1984); <u>Santobello v. New York</u>, 404 U.S. 257 (1971); <u>United States v. Gonzalez</u>, 918 F.2d 1129, 1134 (3d Cir.), <u>cert</u>. <u>denied</u>, 499 U.S. 982 (1991).  Here, Johnson received precisely what the U.S. Constitution provides: a trial. There is no constitutional requirement or expectation that a

state prosecutor offer a defendant a plea.  <u>Gonzalez</u>, 918 F.2d at 1134.

Therefore, where Johnson fails to show any violation of his federal constitutional rights, he is not entitled to habeas relief, and his claim will be denied because Johnson fails to state colorable federal claim.

## V.  <u>CERTIFICATE OF APPEALABILITY</u>

This Court next must determine whether a certificate of appealability should issue.  <u>See</u> Third Circuit Local Appellate Rule 22.2.  The Court may issue a certificate of appealability only if the petitioner "has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  For the reasons discussed above, this Court's review of the claims advanced by petitioner demonstrates that he has failed to make a substantial showing of the denial of a constitutional right necessary for a certificate of appealability to issue.  Thus, this Court declines to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c)(2).

## **<u>CONCLUSION</u>**

For the above reasons, this Court finds that the § 2254 habeas petition should be denied on the merits and a certificate of appealability will not issue.   An appropriate Order follows.


                            /s/ Katharine S. Hayden
                            Katharine S. Hayden
                            United States District Judge

DATED: 12/8/08